# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| ALAN E. THOMPSON, DARRELL G. HINRICHSEN, KEITH P. FOGEL, WALLACE E. ALM and DONALD D. BOE,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED TRANSPORTATION UNION,<br><br>Defendant. | No. 08-CV-65-LRR<br><br>**ORDER** |

## TABLE OF CONTENTS

*I.    INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.   PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.  JURISDICTION AND VENUE* . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
    *A.    Subject-Matter Jurisdiction* . . . . . . . . . . . . . . . . . . . . . . . . *2*
    *B.    Venue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*IV.   STANDARD FOR SUMMARY JUDGMENT* . . . . . . . . . . . . . . . . . . *3*

*V.    SUMMARY JUDGMENT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *A.    Background Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *B.    "Time Claims"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
    *C.    Merger* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
    *D.    Pro Rata Distribution Plan* . . . . . . . . . . . . . . . . . . . . . . . *7*
    *E.    Review Panels* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    *F.    Mistaken Beliefs Discovered* . . . . . . . . . . . . . . . . . . . . . . *8*
    *G.    New Plan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*
    *H.    Distribution of the Settlement Fund* . . . . . . . . . . . . . . . . . *10*
    *I.    Plaintiff Thompson's Internal Union Appeal* . . . . . . . . . . . . *11*

*VI.   MOTION: PLAINTIFFS' DFR CLAIM* . . . . . . . . . . . . . . . . . . . . . *12*
    *A.    Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
    *B.    Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *16*

*VII.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *19*

## I. INTRODUCTION

The matter before the court is Defendant United Transportation Union's Motion for Summary Judgment ("Motion") (docket no. 20).

## II. PRIOR PROCEEDINGS

On October 10, 2008, Defendant filed the Motion.[1] On November 7, 2008, Plaintiffs Alan E. Thompson, Darrell G. Hinrichsen, Keith P. Fogel, Wallace E. Alm and Donald D. Boe filed a Resistance (docket no. 26). On November 17, 2008, Defendant filed a Reply (docket no. 29). Plaintiffs request oral argument in their Resistance, but the court finds oral argument is not appropriate. The Motion is fully submitted and ready for decision.

## III. JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

The only remaining claim is Count III, Plaintiffs' "Breach of Duty of Federal Representation" claim ("DFR claim"). *See* Amended Petition at Law ("Amended Petition") (docket no. 1-3), at 130-144. The court has subject-matter jurisdiction over Plaintiffs' DFR claim pursuant to 28 U.S.C. § 1337(a). *See, e.g., Hunt v. Mo. Pac. R.R.*, 729 F.2d 578, 580 (8th Cir. 1984) (holding that § 1337(a) is the source of federal jurisdiction for duty of fair representation claims); *Raus v. Bhd. of Ry. Carmen*, 663 F.2d 791, 796 (8th Cir. 1981) (same); *see also Breininger v. Sheet Metal Workers Int'l Assoc. Local Union No. 6*, 493 U.S. 67, 83 (1989) ("Federal courts have jurisdiction to hear fair representation suits . . . .").

### B. Venue

The record discloses very little connection between this case and the Northern

---

[1] Except for the filing of the Motion and related papers, the complex procedural history of this case is set forth in Part IV of the Order (docket no. 14) and Part III of the Appeal Decision (docket no. 25). The court need not repeat such history here.

District of Iowa. All of the events in the Amended Petition occurred outside the Northern District of Iowa. Defendant is a labor union that is headquartered in the Northern District of Ohio. Plaintiffs were members and/or officers of one of Defendant's local unions in the Southern District of Iowa.[2] Plaintiff Donald D. Boe is a resident of the Northern District of Iowa.[3] Because neither party questions whether venue is appropriate in the Northern District of Iowa, however, the court deems any challenge to venue to be waived. Fed. R. Civ. P. 12(h); *see, e.g., Wabash Ry. Co. v. Bridal*, 94 F.2d 117, 120 (8th Cir. 1938) ("If [venue] is not seasonably asserted, it will be deemed to be waived.").

## IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.*, 450 F.3d 816, 820 (8th Cir. 2006)

---

[2] This case is no longer a class action. Long ago, the state court dismissed with prejudice all certified class-action claims. In any event, this court has not approved a class under Federal Rule of Civil Procedure 23 with respect to Count III. "The removal of [a] case to . . . federal court does not insulate [a state court's] prior determination from the rigorous review required by Rule 23." *E. Me. Baptist Church v. Union Planters Bank, N.A.*, 244 F.R.D. 538, 541 (E.D. Mo. 2007) (citing Alba Conte & Herbert Newberg, *Newberg on Class Actions*, § 13:29 (4th ed. 2002) ("Federal rules of procedure differ from those used in state court.")).

[3] It appears Plaintiff Boe would gain less than $500 in the event of recovery. In the event of no recovery, all Plaintiffs except Plaintiff Boe must reimburse their attorneys for all out-of-pocket expenses. *See* Contingent Fee Agreement (docket no. 32-2), at 61-62.

(citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. SUMMARY JUDGMENT FACTS

The facts are largely undisputed. Many of Plaintiffs' responses to Defendant's Local Rule 56 individual statements of material fact consist of general denials without citation to or support in the record. Accordingly, the court deems those respective statements to be admitted. *See* LR 56.b. Viewing the evidence in the light most favorable to Plaintiffs and affording them all reasonable inferences, *Baer Gallery*, 450 F.3d at 820, the material facts are these:

### A. Background Facts

Plaintiffs are all former employees of the now defunct Chicago and North Western Transportation Company f/k/a Chicago and North Western Railway a/k/a "the North

4

Western" ("the CNW").[4] Plaintiffs are also all current or former members of Defendant, an international labor organization. Plaintiffs were members of Defendant's Local 316 in Clinton, Iowa.

Pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, Defendant served as the certified collective bargaining representative for certain crafts and classes of the CNW's employees. Defendant entered into numerous agreements under the RLA with the CNW concerning rates of pay, rules and working conditions.

### B. "Time Claims"

Defendant protected the rights of the CNW's employees, in part, by pursuing "time claims." For example, if the CNW asked an employee to skip a required break, the employee could claim a penalty payment, commonly between four and eight hours of additional pay. Similarly, if the CNW asked an employee assigned to perform road service to perform yard service, the employee could claim an extra day of pay.

The CNW's employees routinely filed time claims. For example, Plaintiff

---

[4] In 1867, the CNW became the first railroad to cross Iowa. Frank P. Donovan, Jr., *The North Western in Iowa*, *in* Iowa Railroads 132 (H. Roger Grant ed., 2000). Of the CNW's "high iron" between Clinton and Council Bluffs via Cedar Rapids, the most celebrated Iowa railroad historian writes:

> Presidents and visiting nobility, immigrants and millionaires, tourists and businessmen—indeed, people from every corner of the globe sped across Iowa on their way to and from the fabled West. Fast mail trains kept the rails hot. . . . It was a grand cavalcade, a spectacular cross section of America and a fair sampling of visitors from every civilized nation. It is safe to say that, while it lasted, more people from more places rode the North Western across Iowa than any other transcontinental rail route in North America.

*Id.* at 147. The CNW later built "'the longest, highest double-track railroad bridge in the world' over the Des Moines River near Boone," the Kate Shelley Viaduct. *Id.* at 144.

Thompson testified: "Some days I may have written five or six claims in a single day," resulting in "[t]housands" of claims over his career. Def. App. at 141. Plaintiff Fogel also had "[t]housands" of claims. *Id.* at 88.

A backlog of time claims accumulated over time. In some cases, it took over two decades for the CNW and Defendant to resolve time claims. Eventually, the backlog grew to 28,000 time claims.

### *C. Merger*

In 1995, the CNW merged into the Union Pacific Railroad ("the UP"). Defendant continued to serve as the collective bargaining representative for all UP employees who used to work for the CNW.

Immediately prior to the merger, Defendant and the UP negotiated a Merger Implementing Agreement ("MIA"). The MIA governed the manner in which then-existing labor agreements necessarily would change as a result of the merger of the operations of the CNW into the UP. While negotiating the MIA with Defendant, the UP became concerned about the backlog of time claims. The UP desired a fresh start with Defendant and the CNW employees.

In 1996, the UP and Defendant reached a series of written agreements (collectively, "1996 Settlement Agreement") after arms-length negotiations on a number of matters, including the time claims. The terms of the 1996 Settlement Agreement were as follows: (1) the UP agreed to pay Defendant a one-time, lump-sum payment of $9.8 million ("Settlement Fund") to settle the vast majority of backlogged time-claims; (2) Defendant agreed to determine the validity and amount of the time claims; (3) the UP agreed to write checks payable to the claimants as directed by the Union after the completion of the Union's claim-review process;[5] (4) the UP agreed Defendant was entitled to earn interest

---

[5] It appears the parties agreed the Settlement Fund would remain in the UP's
(continued…)

6

on the Settlement Fund until the time of its distribution, even though railroads traditionally did not pay interest on time claims; (5) the UP agreed to permit members of Local 316 to continue to work out of Clinton, Iowa; and (6) Defendant agreed to amend the parties' "Crew-Consist Agreement," so that newly hired employees would receive lower wages.

### D. Pro Rata Distribution Plan

In August of 1996, Defendant's General Committee of Adjustment No. 225 ("Committee") held a meeting to decide how to distribute the Settlement Fund. The Committee is a democratically elected intermediate-level body within Defendant. Local unions, including Local 316, each elected a Local Chairman who also served as a member of the Committee. The members of the Committee then elected the Committee's General Chairman and Vice General Chairman.

At the time of the meeting, the Committee's members generally believed the value of the time claims exceeded the amount of the Settlement Fund. For this reason, the Committee's members overwhelmingly voted to distribute the Settlement Funds to claimants on a pro rata basis.

Specifically, the Committee decided to establish three-person "review panels" within Defendant to determine the validity and monetary value of each time claim. After the validity and monetary value of all time claims were established, Defendant would instruct the UP to distribute the Settlement Fund to claimants on a pro rata basis. The value of each time claim would be multiplied by a payment percentage. The payment percentage would equal the amount of the Settlement Fund divided by the total value of all valid claims.

After the meeting, the Committee issued a letter, "Circular Letter No. 30," to all

---

$^5$(…continued)
possession until the time of distribution, hence this provision and the parties' later negotiations over the UP's payment of compound or simple interest on the Settlement Fund.

Local Chairmen. Circular Letter No. 30 memorialized the Committee's agreed-upon method for reviewing time claims and allocating the Settlement Fund.

### *E. Review Panels*

Defendant's review panels engaged in the time-consuming and laborious process of determining the validity and monetary value of each time claim. The Committee's General Chairman and Vice General Chairman served on review panels, and Local Chairmen traveled from Illinois, Iowa, Michigan, Minnesota, Nebraska, South Dakota and Wisconsin to review claims at the Committee's offices in Wisconsin. Defendant paid the Local Chairmen for their time, as well as per diem and travel expenses. Plaintiff Fogel was Local 316's Local Chairman and reviewed time claims for some of Local 316's members.

All Plaintiffs had time claims pending at the time the CNW merged into the UP. The review panels established the following values for each Plaintiff's time claims: Plaintiff Fogel, $65,388; Plaintiff Thompson, $62,770; Plaintiff Hinrichsen, $29,897; Plaintiff Alm, $14,148; and Plaintiff Boe, $587.

### *F. Mistaken Beliefs Discovered*

Early in the review process and while serving on review panels, the General Chairman and Vice General Chairman ruled that a large class of time claims were invalid. Although two local unions appealed these decisions through an internal union mechanism, such appeals were denied. These denied time claims constituted a significant portion of the backlog.

The General Chairman soon realized the amount of the Settlement Fund would exceed the value of valid claims if Defendant were able to reach a favorable resolution with the UP on two outstanding issues relating to the Settlement Fund. The first outstanding issue was whether the UP or Defendant would pay the payroll railroad retirement taxes due on all disbursements. The second outstanding issue was whether the UP would pay compound or simple interest on the Settlement Fund.

In August of 2001, the General Chairman informed the Committee about the possibility the Settlement Fund might exceed the value of valid time claims. One member of the Committee, Mr. Jerry Kalbfell, the Chairman of Local 528 in Chicago, Illinois, wrote to the General Chairman in Wisconsin and proposed scrapping the pro rata plan. Chairman Kalbfell proposed that all claimants receive the full value of their time claims as determined by the review panels but that any excess be divided equally among all of Defendant's members currently under the jurisdiction of the Committee. Chairman Kalbfell argued:

> We all anticipated that the total settlement value of the valid claims would exceed $9.8 million, and that each claimant would have to accept a proportionately reduced amount on their claim's settlement value. Additionally, we all felt that the claims review would be completed in a relatively short time.
>
> Reality did not match our projections . . . .
>
> Some will argue that the surplus should be distributed proportionately between the successful claimants. However, this simple solution is unfair. The successful claimants are a small portion of our current membership, and distributing the surplus to them alone does not take into account the contributions of many other members who made the settlement possible.
>
> Two major factors that helped persuade the carrier to make the $9.8 million settlement were the sheer volume of claims, and our agreement that [newly hired employees would receive lower wages]. Considering those two factors, every member that submitted a claim[,] whether valid or not, and every member hired out after the [1996 Settlement Agreement], made a substantial contribution to our negotiating position.

*Id*. at 309-10.

In September of 2002, the Committee's review panels finished reviewing the time

9

claims. The Committee found the total value of all valid time claims was $6.5 million. Meanwhile, the value of the Settlement Fund grew to $11.3 million after the UP conceded to Defendant's demands and agreed to pay compound interest and all payroll railroad retirement taxes on disbursements. Therefore, contrary to the Committee's original assumption when it adopted the pro rata plan, there was a $4.8 million surplus in the Settlement Fund.

### G. New Plan

Members of the Committee put forward three competing plans for distribution of the Settlement Fund. "Option A" had three prongs: (1) all persons with valid claims would receive the full value of their claims; (2) the Committee would receive $250,000 to cover the expenses it incurred to determine the value of the time claims, including all expenses associated with convening the review panels; and (3) the remainder of the Settlement Fund would be distributed on an equal basis to all active union members within the jurisdiction of the Committee who were working in train or engine service. "Option B" kept the original pro rata plan with two exceptions. The first exception was that $250,000 would be paid to the Committee for the aforementioned administrative expenses. The second exception was any unclaimed portion of the Settlement Fund would be distributed to all active union members within the jurisdiction of the Committee. "Option C" retained the originally agreed-upon pro rata distribution method as set forth in Circular Letter No. 30.

A majority of the members of the Committee voted for Option A. Fourteen members voted for Option A; five voted for Option B; and one voted for Option C. Plaintiff Fogel voted for Option B on behalf of Local 316 and at the instruction of Plaintiff Thompson, the Secretary of Local 316.

### H. Distribution of the Settlement Fund

In late December of 2002, the UP paid out the Settlement Fund in accordance with

Option A.[6] First, the UP paid the Committee $250,000 for its costs in administering the review panels. Second, the UP distributed the Settlement Fund to 2988 people in varying amounts. Division of the excess portion of Settlement Funds resulted in a distribution of $2,508.95 to all members of Defendant under the jurisdiction of the Committee. Specifically:

The UP issued checks to 1284 persons for the amount of their valid claims as determined by the review panels. These persons had submitted valid or partially valid time claims but were no longer members of Defendant.

The UP issued checks to 744 persons for the amount of their valid claims as determined by the review panels plus an excess payment of $2,508.95. These persons had submitted valid or partially valid time claims but were still members of Defendant.

The UP issued checks to 960 persons in the amount of $2,508.95. These persons had not submitted valid time claims but were members of Defendant at the time of the distribution.

### *I. Plaintiff Thompson's Internal Union Appeal*

In late 2002 through early 2003, Plaintiff Thompson challenged the Committee's decision to scrap the pro rata plan and adopt Option A. Plaintiff Thompson brought his challenge through internal union channels and pursuant to Defendant's constitution. During the challenge process, Defendant sought the opinion of an outside arbitrator, Mr. Joshua Javits. Mr. Javits is a former Chairman and Member of the National Mediation Board and has experience in labor matters arising in the railroad industry. On December 12, 2002, Arbitrator Javits opined:

> In this case, where the claimants already received 100% of their claims, it would be highly unusual for the remainder to

---

[6] It appears the UP initially retained $250,000 on behalf of Defendant to cover any erroneous underpayments or omitted payments. However, the parties do not include such fact in their respective statements of individual material fact.

> be distributed only to them. To my knowledge there is no precedent for the payment of interest on claims in the railroad industry. The payment of greater than 100% of the individuals['] claims would tend to place them in a special category. The legitimate interest and legal obligation of the union in representing the interests of all members of the craft or class is best served if the remainder is distributed to all members.

*Id.* at 370. On April 4, 2003, Defendant denied Plaintiff Thompson's appeals.

## VI. MOTION: PLAINTIFFS' DFR CLAIM

Plaintiffs invited the Motion in their "Appeal from the Magistrate Ruling on Their Motion to Amend" ("Appeal") (docket no. 19). Plaintiffs wrote:

> Plaintiffs have never believed that this is a duty of fair representation case. They were forced to assert such a claim to save this action from outright dismissal by the [s]tate [c]ourt.[7] Based on its findings in the 2003 Lack of [Complete] Preemption Ruling, Plaintiffs do not believe this Court will now conclude that [Defendant's] misconduct gives rise to a federal breach of duty of fair representation claim. Plaintiffs could face eventual dismissal of [Count III] by this Court . . . upon [Defendant's] summary judgment challenge.

Appeal at 5-6 (citing in part *O'Hara v. Dist. No. 1-PCD, MEBA, AFL-CIO*, 56 F.3d 1514 (D.C. Cir. 1995)). Because Plaintiffs now vigorously resist the Motion and Defendant does not assert some form of estoppel, the court will summarize the relevant law and then consider the merits of the Motion.

---

[7] The state court granted Plaintiffs' eleventh-hour request to amend their Petition to assert their DFR claim after years of litigation and dismissal of all of their state law claims on Defendant's motion for summary judgment. Plaintiffs were not "forced" to assert a non-meritorious federal claim. Plaintiffs had the right to perfect a final appeal of the state court's dismissal of their state law claims but did not do so.

## A. Law

Plaintiffs bring their DFR claim under the RLA. "Suits by employees against only their unions for a breach of the duty of fair representation do not fall under the explicit provisions of the [RLA] because they are not 'disputes between an employee or group of employees and a carrier or carriers' within the meaning of the [RLA]." *Raus v. Bhd. Ry. Carmen*, 663 F.2d 791, 794 (8th Cir. 1981) (citations omitted). Rather, the DFR claim "'judicially evolved' as part of federal labor law." *Breininger*, 493 U.S. at 79 (citations omitted). The Supreme Court created the DFR claim "in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the [RLA]." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967) (citing *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192 (1944) and *Tunstall v. Bhd. of Locomotive Fireman & Enginemen, Ocean Lodge No. 76*, 323 U.S. 210 (1944)). "Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.*; *see, e.g., Humphrey v. Moore*, 375 U.S. 335, 342 (1964) ("The undoubted broad authority of the union as exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation. 'By its selection as bargaining representative, it [becomes] the agent of all the employees, charged with the responsibility of representing their interests fairly and impartially.'" (quoting *Wallace Corp. v. NLRB*, 323 U.S. 248, 255 (1944))).

"The duty of fair representation is . . . akin to the duty owed by other fiduciaries to their beneficiaries." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 74 (1991). The Supreme Court has likened the relationship between union and employee to "the duty a trustee owes to trust beneficiaries," *id.*, the duty an attorney owes clients, and "the

13

responsibilities of corporate officers and directors toward shareholders," *id.* at 75. "Just as these fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Id.* (citing in part Restatement (Second) of Trusts § 174 (1959)).

The duty of fair representation is "a right primarily and jealously guarded by the judiciary." *Augspurger v. Bhd. of Locomotive Eng'rs*, 510 F.2d 853, 857 (8th Cir. 1975). "[T]he duty of fair representation [stands] as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca*, 386 U.S. at 182. A DFR claim "is an essential means of enforcing fully the important principle that 'no individual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers.'" *Breininger*, 493 U.S. at 79 (quoting *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)). The doctrine is inherently "flexib[le]" and "adaptab[le]." *Id.* at 86. That said, the duty of fair representation "is a purposely limited check." *United Steelworkers of Am., AFL-CIO-CIC v. Rawson*, 495 U.S. 362, 374 (1990); *Augspurger*, 510 F.2d at 858 (characterizing the DFR as a "limited" doctrine).

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190; *see also Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998) (reiterating tripartite standard); *Air Line Pilots*, 499 U.S. at 67 (same). A union's actions are "arbitrary" only if "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots*, 499 U.S. at 67 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). A union's actions against a member of the collective bargaining unit are "discriminatory" only if such actions are "intentional, severe, and unrelated to legitimate union objectives." *Lockridge*, 403 U.S. at 301. To

14

show that a union acted "in bad faith," a plaintiff must show "'substantial evidence of fraud, deceitful action or dishonest conduct.'" *Id.* at 299 (quoting *Humphrey*, 375 U.S. at 348).

"Most fair representation cases require great sensitivity to the tradeoffs between the interests of the bargaining unit as a whole and the rights of individuals." *Breininger*, 493 U.S. at 77. Unions are afforded "room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez*, 525 U.S. at 45-46. "Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature." *Air Line Pilots*, 499 U.S. at 78. "Any substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Id.* The Supreme Court has stressed "the importance of evaluating the rationality of a union's decision in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made.'" *Id.* The mere fact the leadership of a union is opposed to a union member or his views, however, is insufficient to support a DFR claim. *Jones v. UPS, Inc.*, 461 F.3d 982, 994 (8th Cir. 2006). Further, "'[m]ere negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation.'" *Id.* at 994 (8th Cir. 2006); *see also United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. at 372-73 ("[M]ere negligence [does] not state a claim for breach of the duty of fair representation . . . .").

Traditionally, DFR claims allege "the union's conduct was motivated by an employee's lack of union membership, strifes resulting from intraunion politics, and racial or gender considerations." *Breininger*, 493 U.S. at 78. In the seminal cases of *Steele* and *Tunstall*, the Supreme Court held that two classes of plaintiffs stated DFR claims where they alleged their unions engaged in blatant racial discrimination. *Steele*, 323 U.S. at 193-208; *Tunstall*, 323 U.S. at 211-14. The unions negotiated agreements to the plaintiffs'

15

great detriment without giving them notice or an opportunity to be heard. *Steele*, 323 U.S. 194-97; *Tunstall*, 323 U.S. at 211-12. The plaintiff in *Steele*, for example, alleged the union charged with representing his interests under the RLA was "hostile and disloyal" to African-American firemen, "deliberately discriminated against them, and . . . sought to deprive them of their seniority rights and to drive them out of employment in their craft . . . ." 323 U.S. at 196-97.

## *B. Analysis*

Plaintiffs argue Defendant breached its duty of fair representation to Plaintiffs when it abandoned the pro rata plan and adopted Option A. Plaintiffs stress that Defendant's decision caused them to suffer monetary loss for the benefit of current union members. Plaintiffs opine that the Union's decision to "breach" the pro rata plan was "arbitrarily" made and amounts to a "blatant and unapologetic misappropriation of settlement funds owed to Plaintiffs" in favor of current union members "who had no legitimate claims" to the proceeds. Resistance at 6, 7 & 9.

The court holds Defendant did not breach its duty of fair representation to Plaintiffs. Defendant's decision to scrap the pro rata plan was not "arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190; *Marquez*, 525 U.S. at 44; *Air Line Pilots*, 499 U.S. at 67. Defendant's actions were reasonable when judged in light of the factual landscape at the time of its actions. *Air Line Pilots*, 499 U.S. at 67. At the time Defendant adopted the pro rata plan, Defendant reasonably assumed the Settlement Fund would not cover all valid time claims. Only after this reasonable assumption proved false did Defendant devise a plan for distributing the excess in the Settlement Fund.

Option A is not "arbitrary" or "so outside a 'wide range of reasonableness' as to be irrational." *Id*. The payment of $250,000 to the Defendant to cover administrative expenses was not self-dealing or a misappropriation of funds to which Plaintiffs were entitled. The payment was a reasonable way to cover the expenses Defendant incurred

while processing the time claims over a number of years. Such payments are common in the trust context. *Cf.* Restatement (Second) of Trusts § 242 ("[T]he trustee is entitled to compensation out of the trust estate for his services as trustee . . . ."), § 244 ("The trustee is entitled to indemnity out of the trust estate for expenses properly incurred by him in the administration of the trust.") (cited with approval in *Air Line Pilots*, 499 U.S. at 75).

Option A made Plaintiffs whole. Plaintiffs had no legitimate expectation to recover anything more than the full value of their valid claims. Defendant did not have a duty to confer a windfall upon Plaintiffs after Defendant negotiated the profitable 1996 Settlement Agreement on Plaintiffs' behalf. The sheer volume of claims—valid and invalid—in part induced the UP to settle. Some current union members forwent salary in the 1996 Settlement Agreement. In light of such circumstances and consideration, it clearly was not arbitrary or outside a wide range of reasonableness for Defendant to decide to confer the excess in the Settlement Fund upon all active members.

Plaintiffs are not members of any protected classes for purposes of discrimination analysis. There is no evidence Defendant discriminated against Plaintiffs in a manner that was "intentional, severe, and unrelated to legitimate union objectives." *Motor Coach Employees*, 403 U.S. at 301. In the hard-scrabble area of labor disputes, *see Delaney v. Int'l Union UAW Local No. 94*, 675 N.W.2d 832, 834 (Iowa 2005) ("Labor disputes are not for the faint of heart."), there will always be winners and losers. The Supreme Court and the Eighth Circuit Court of Appeals have each recognized that "'the complete satisfaction of all who are represented is hardly to be expected'" and a plaintiff does not have a cause of action against a union whenever the union's decision "'may have unfavorable effects on some of the members of the craft represented.'" *Augspurger*, 510 F.2d at 859 (quoting *Ford Motor Co.*, 345 U.S. at 338 and *Steele*, 323 U.S. at 203). Federal courts have repeatedly declined to find "discrimination" in cases like the case at bar, wherein the defendant-union makes a good-faith and reasonable decision that happens

17

to favor one group of its members over another. As the Supreme Court stated long ago:

> [W]e are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another. In *Ford Motor Co. v. Huffman*, 345 U.S. 330, the [Supreme] Court found no breach of duty by the union in agreeing to an amendment of an existing collective bargaining contract, granting enhanced seniority to a particular group of employees and resulting in layoffs which otherwise would not have occurred. "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.' *Id.*[ at] 338 . . . . Conflict between employees represented by the same union is a recurring fact.

*Humphrey*, 375 U.S. at 349-50; *see also Air Line Pilots*, 499 U.S. at 81 ("The suggestion that the "discrimination" between striking and working pilots represented a breach of the duty of fair representation also fails. If we are correct in our conclusion that it was rational for ALPA to accept a compromise between the claims of the two groups of pilots to the 85-5 bid positions, some form of allocation was inevitable. A rational compromise on the initial allocation of the positions was not invidious "discrimination" of the kind prohibited by the duty of fair representation."); *O'Hara*, 56 F.2d at 1522-24 (holding that district court abused its discretion in issuing preliminary injunction, in part because "plaintiff employees will have an uphill battle ahead of them if they are to succeed on the claim that they are entitled to the entire award"); *Panrell v. United Mine Workers of Am., Int'l Union*, 872 F. Supp. 1502, 1508-9 (S.D. W. Va. 1995) (finding "insufficient evidence to

prove that the [defendant union] was politically motivated, or motivated in an improper way, when it determined that instead of the distribution class consisting of just the 207 members that it should consist of the entire membership . . . for whose benefit the . . . litigation was brought" and holding union "would have been remiss in its duties and obligations to its membership to have done otherwise").

Finally, Plaintiffs have not alleged or presented any evidence to show Defendant acted in bad faith. There is no "'substantial evidence of fraud, deceitful action or dishonest conduct.'" *Lockridge*, 403 U.S. at 299. A majority of the democratically elected Committee openly and fairly voted to balance the competing claims of their constituents in the manner Plaintiffs mostly opposed.[8] *See Thorn v Amalgamated Transit Union*, 305 F.3d 826, 833 (8th Cir. 2002) (quoting *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 688-89 (1987) (Powell, J., concurring in part and dissenting in part)) ("Like other representative entities, unions must balance the competing claims of [their] constituents."). Plaintiffs had notice and an opportunity to be heard, and they lost.

Accordingly, the court must dismiss Plaintiffs' DFR claim.

## VII. CONCLUSION

**IT IS THEREFORE ORDERED**:

(1)   The Motion (docket no. 20) is **GRANTED**;

(2)   The Amended Petition (docket no. 1-3) is **DISMISSED**;

(3)   All pending motions are **DENIED AS MOOT**;

(4)   This case is **DISMISSED WITH PREJUDICE**; and

(5)   Plaintiffs shall pay Defendant's costs.

---

[8] Plaintiffs Thompson and Fogel voted for Option B and thus supported the scrapping of the pro rata plan. Because of the court's disposition of this case, the court need not address Defendant's argument that such Plaintiffs waived their DFR claim.

**IT IS SO ORDERED.**

**DATED** this 15th day of December, 2008.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA